We will proceed to Absolute Cleaning against the Industrial Commission, SCAR 100313. Counsel, please. Can you please report? My name is Theodore Powers and I represent the employer, Absolute Cleaning. Mr. Bresciardi and I are back today. This is an appeal of a split decision of the commission. The issues on appeal are, one, whether the petitioner exceeded her Section 8A position choice limitation. Two, whether the petitioner's condition of ill-being and need for corrective surgery is related to her work accidents. Three, the reasonableness of the medical treatment, including the prospective surgery ordered by the commission. And four, whether the award of TPD benefits is supported by the evidence. We have two claims here that were filed by the petitioner. One is for an accident on May 9, 2006. The second one occurred on November 6, 2006. They both involve a lifting incident and they both involve claiming injuries to both her neck and her back. The petitioner was an eight-month employee at Absolute Cleaning and she was doing cleaning services or providing those services at two coal mines under a contract. The first accident is relatively simple in terms of the treatment. She treated with a Dr. Callaway chiropractor. Went there, I believe, four occasions in a month's span or even less than a month's span. She was released back to Coles and she lost a couple days of work. The only thing noteworthy in terms of this accident is that she gave a history of true or prior problems with her neck and back. And she had indicated in her history when she testified that she had had problems like a year or two years prior. And there were some incidents that she talked about, some altercations with boyfriends and that. But the history she gave to Callaway when she initially saw him was a history of having a problem going a week prior. And she saw him on the date of the accident. Are we into the merits or are we into the referral issue? We're going to the referrals in a second. I'm just opening it up in terms of this first accident. Because the referral issue comes out with the second, Your Honor. So the bottom line is that there was a credibility question raised because she had apparently been receiving treatment after this accident, before this accident, just prior to this second accident. And that was noted by Commissioner Lindsey in her dissent. It took exception to that. It was a Dr. Wahab and Petitioner failed to produce those records. We'll move along. We are dealing initially with the doctor's choice issue. Second accident, she initially goes back to number one, or Dr. Callaway. He's doctor number one. Dr. Callaway makes his diagnosis, strain, radiculitis. And while Petitioner is treating with Dr. Callaway, a couple days later, she now goes to Dr. Sprinkel. Dr. Sprinkel is part of, actually Dr. Sprinkel is a physician's assistant at her family doctor's facility, a county facility. And she proceeds to treat simultaneously with both Dr. Sprinkel and with Dr. Callaway. She sees Dr. Sprinkel from November the 8th, 2006, two days after the accident, until April the 3rd of 2007. Dr. Sprinkel provides physical exams, provides medications, and also consulted with her when she had a subsequent MRI. Petitioner was not referred to Dr. Sprinkel or to the McCoupin Medical Clinic by Dr. Callaway. So Dr. Sprinkel is doctor number two. Okay, so so far so good. Where's the problem? The problem comes in, you're going to say, with regard to her tell in Pensac, right? Correct. But now we have her next going to see, or wanting to see, a doctor for tell. And wasn't that due to a referral by Callaway? Well, it depends on what you want to classify a referral as. Is it a legitimate referral? The fact that Dr. Callaway fills out this really neat note, which indicates the name, the address of Dr. Hirtel, the phone number, and faxes right away to the attorney after the attorney had already indicated he wanted her to see Dr. Hirtel. Well, who's going to decide whether it's a legitimate referral or not? Us or the commission? I think it's determined based upon the evidence that this is not a legitimate referral, that this is not. Wait a minute, just because the patient says, I want you to refer me to Dr. X, you suggest that that's a legitimate referral. Why? Well, I think the provisions of the Act of Section N.A. make it pretty clear. Yes. Recommended by the doctor. But his record says he did. Pardon me? His record says he did refer her. His record specifically says he referred her. Well, you can have down a written note indicating there's a referral, but then when the petitioner testifies that she told Dr. Callaway, or she testified to the fact that it was her choice to see Dr. Hirtel, when she testified that her attorney wanted her to see Dr. Hirtel. What's wrong with that? Huh? What's wrong with her attorney suggesting a doctor? We're talking about in terms of a referral. Isn't it her attorney's job? Can I ask a question? I'm sorry. Is there anything wrong with her attorney helping guide her through the process? Absolutely not. Ask your doctor if he'll refer you to Dr. Hirtel. There's absolutely nothing wrong with the attorney. So why is it illegitimate? It's not a question of being illegitimate. The question is that it's not a referral. The doctor referred. The doctor made the referral. But I guess, Your Honor, my problem with it is as follows. The reason for a referral, from my understanding, and remember, the employers are assuming liability for all these referrals. You go to a doctor, your family doctor, whatever, and you have a condition, and that doctor says, you know what, you need to see an orthopedist. You've got an ortho problem. I don't handle that. I'm going to refer you to an orthopedist. All right? I can't treat you, or I think you're better suited to treat with that doctor. Section 8A talks about recommended by that doctor. Recommended is the fact that the petitioner goes before her doctor and says, I want to treat with this doctor, Dr. Hirtel. Is that a legitimate referral? All right. Here's what you're saying. Let's just cut to the chase. You have a superficial appeal. We could parse back and forth, us and you. What you seem to be saying is, look, this is sort of an artificial device to circumvent the two-physician rule. Okay? Correct. All right. Let's assume you're correct in it. Here's your problem. How do you get around the Elmhurst-Chicago Stone case? Even if we like your appeal, your position on superficial appeal, doesn't the law basically say it doesn't matter how he gets into the chain as long as the doctor refers him? It doesn't really matter at whose suggestion it's made, whether it's the lawyer or the claimant. I mean, isn't that what the case stands for? I don't think it stands for. I believe that when you have a petitioner who sits there and makes it very clear to her during her testimony, I'm calling the shots. I mean, that's my view of her, my interpretation of her testimony. What does Dr. Callaway's note of December 8, 2006 say? I'll read it to you. I would like to refer the claimant to Dr. Ronald Kertel because I suspect a cervical disc problem. Correct. Yeah? And prior to that point in time, she had already been talking with her attorney, or her attorney had told her about wanting to send her to her doctor because he's the best. If Callaway is going to refer her out because she has a cervical disc problem, what difference does it make where he gets the name of the orthopod that he's referring her to? You're saying if it comes from her attorney and she requests to be referred to Dr. A, that's no good. Callaway's got to do this on his own without any input from the claimant. Why? Well, I think that Section 8A says you choose, all right, and then after that there's a recommendation for referral. It's not I choose, I choose again. Can't we presume that Dr. Callaway would not have made the referral if he could not recommend that doctor? No. I mean, if it was somebody who was a total quack and everybody knew he was a total quack, wouldn't Dr. Callaway say no? Up to that point in time, Your Honor, before the referral came, there was talk that she may need an MRI. There was testimony that she needed to be referred to Dr. Gertel for getting an MRI, which to me makes no sense. She could have gotten an MRI, I presume, by Dr. Callaway or by Dr. Gertel. We can go back and forth. It's an interesting discussion, and I'm almost reluctant to bring the law into the mix. I'll tell you where we end up. So Chicago Stone quoting the passage, it says, similar issue as you know, quote, no matter how Dr. Bartucci's name came up, claimants treating doctors still referred him to Dr. Bartucci. Accordingly, Dr. Bartucci is in the chain of referral. Okay. So how do you get around that? It says it doesn't matter how he was referred to. I believe that based upon her testimony in combination with the attorney saying that he wanted her to go to this doctor and then her saying it's my choice, I instructed essentially Callaway to refer me. I believe that is not a recommendation under Section 8A as contemplated by Section 8A. Well, you can talk about Section 8A all you want this morning. The case law doesn't support your argument. And what I'm trying to implore, if you will, upon you is that the purpose of Section 8A, law and this provision, was to allow for or to prevent doctor shopping. And does this look like doctor shopping? Well, then move on. Your final point should be you're asking us to overrule Elmhurst Stone. That's got to be your position. So under your view, Your Honor, we're still on two. So now we have Dr. Penson. Now what's the deal with Dr. Penson? How does she get to Dr. Penson? Was he referred by Callaway? Pardon me? Was he referred by Callaway? No, I don't think it's in the record on that one. That one's not in the record. Now we have a three, based upon what I'm looking at. But we still did. And just remember what happened here. So she goes to Dr. Hertel. She wants to see him, and she has a real tough time with Dr. Hertel. Dr. Hertel can't find anything wrong with her. Dr. Hertel apparently is rude, didn't spend enough time with her. And according to what we're looking at under these facts, Dr. Hertel, who apparently was going to order MRIs, based upon what she said to him, just said don't come back. And apparently her attorney, according to her, had to get Dr. Hertel then to order those MRIs. Look, I don't want to spend all your time arguing this issue. Fine. You've conceded that there's a written referral from Callaway to Hertel, correct? However, we got to Hertel. There is a written referral, as Justice Hoffman quoted. Doesn't Pen 6 Treatment Note indicate that he saw the claimant on a referral from her chiropractor? It's based upon that testimony, but if you're going to take that view, we'll look at what the records show from Dr. Callaway. There is a really nice, clean, thorough note saying, I want you to see Dr. Hertel's name, address, everything. There's nothing about Dr. Pen 6. Now, in addition to there being nothing from Dr. Pen 6, she has her attorney write a letter to us talking about, could you give us authority for her to treat with Dr. Pen 6? Does that mean that there's a third doctor problem here? These are all facts that the commission could have used to rule in your favor. They chose not to. They decided the factual issue against you. There is evidence in the record that supports their decision. I mean, it's just as simple as that. No, no, I understand, Judge. And I guess the way I look at it is, sometimes, just like I do things wrong, we all do things wrong at the commission, that's a mistake. Sometimes they don't get it. Sometimes they don't find it correctly. Wait a minute. That's why we have the standard to come through. Our job here isn't to determine whether we would have ruled the same way. Our job here is to determine whether there is any legitimate evidence in the record that supports the commission's decision. If the answer to that question is yes, you lose. I understand that. For every one of these doctors, there is evidence in the record that there was a referral from Callaway. That's a guy I haven't seen, Your Honor. She testified that Callaway referred her to Pensick. No, what she said was, in quote, I choose for her, Dr. Callaway, to refer me. I choose her to refer me. And Pensick writes in his notes that he's seen the claimant after a referral from her chiropractor, and he repeated it in his deposition. What do you want the guy to do? I mean, he said Callaway referred her. What more does there have to be? I understand what you're saying. You don't think the commission should have believed anything. When you look at the entire case and what went down, you look at the symptom magnification that's shown throughout this record, the excess in her complaints, you look at her being frustrated with Dr. Pensick when she first goes to see him about the fact that he didn't set her up for immediate surgery. You see the second time she went to Dr. Tate for the IME, there's just more severe symptom magnification, a significant amount of that. You look at the evidence showing she's now been treating with a chiropractor, which, by the way, she told Dr. Pensick, Dr. Pensick said it was fine to keep doing that, and he's like, I never said that to her. I didn't recommend that. I don't know if it would be effective. But she goes to the chiropractor two years. Two years later, she has no symptoms. She has the same symptoms. She's worse. She goes to Dr. Tate, and she's crippling. Your time is up, counsel. You have time. We're going to move on. Counsel, please. Thank you, Your Honor. I'm very pleased. The court, job assuring counsel. With respect to the chain of referral, I believe the evidence supports the commission's finding. I think our brief addresses that well. I'm not going to belabor that point. I think we covered that adequately. Yes. I believe the majority's opinion here and its findings is not against the manifest way of the evidence. In fact, there is a significant basis for the majority's opinion, including causation opinions by not just the treating doctor, but also the respondent's examining physician on the issue of causal relationship. With respect to the dissent and the issues that have been injected into the case, I believe in our brief we also noted that the respondent had the ability and, in fact, did bring forward prior treatment records. There was no attempt to hide, and certainly the inference drawn by Commissioner Lindsey could have easily been drawn by the respondent, since it was the respondent's counsel who questioned the petitioner at the hearing about this. Well, that's really it. ABSLU didn't have the time to make the argument, so we'll raise it because they didn't have the chance to. That seems to be really the other critical issue on the merits. They seem to be arguing that your client had some back and neck problems for several years before the accident, and that this is a preexisting degenerative disease. So how do you respond to that argument? First with price versus industrial commission, and I think that the factual basis for the commissioner's inferences is mistaken. I believe that the commissioner infers something that is not in the records. I think that there is also the possibility that the doctor made a typographical error, because she did, in fact, have treatment two years prior, and she did disclose to that doctor on that visit her prior problems. And I'm referring to Chiropractor Callaway. If there was an attempt to hide a previous condition, would she have disclosed the prior problems that she had? I don't think so. I think that's where the inference falls short. With respect to the commissioner's second complaint about the medical records and the discrepancy between the medical record and the petitioner's testimony, again she refers to her returning to Dr. Callaway in the fall of November and her reporting that she stopped working in October or two weeks prior. Counsel and respondent never argued she wasn't working on November 6th. She was working on that date. There is no dispute that she had an accident on that date. It is just as easy to assume that there was, again, a typographical error. Certainly if there are medical records that would support a respondent's position that a week beforehand or two weeks before in May she actually sought treatment for a neck and shoulder problem, then I would expect that counsel would order that as well. He has that right under the Act. The Act gives him that right. And there were no records offered by respondent either. The opposite inference could be easily made as well. If there's no records offered by respondent, then those records either don't exist or, in fact, they don't say what was claimed. Your position, in essence, is there sufficient evidence in the record to support the commission's decision. Yes. It's just a matter of the commission. More or less. Exactly. With respect to the issue of prospective medical, I think there's... The same standard. The same standard. Manifest weight. Do you have a neurosurgeon? The commission adopts the opinion of the neurosurgeon that what he would do is... Future operations recommended by Appensix, same standard. Yes. With respect to the TTD issue, there is no evidence that the petitioner or the employee was let go for an economic layoff. The only evidence in the record is that she was working light duty. She was working light duty on restrictions that both the respondent's examining physician and her treating doctor said she should be working. It was only after she was told she had surgery that she could not work. She was actually working in Decatur at a different facility than where she was injured. So they had lost the contract at the mine, to be sure, but they were continuing to employ her on a light-duty basis. The chiropractic care allowed her to continue working at least on a light-duty basis, and she continued to earn income. That is not a person who's magnifying symptoms. It's not a person who's trying to be off of work. And she would still be working light duty if she could, and they were paying a temporary partial. So I think that all of the commission's findings here are supported by the manifest weight of the evidence, and there's no legal conclusion that's been made by the commission which supports a reversal of any of their findings. On that basis, we would request that the decision be affirmed. Thank you. Counselor, anything on the merits? Are we back to the physician referral issue? I do have a problem with it, and maybe it's because of the things that are going on right now, and I'm not going to get up here on the soapbox or whatever, but one of the things being discussed now with changes in the law is dealing with this issue of, do we take away some of the choice from the employees because of the hypothesis, and the problems that we encounter with this referral playing around. And whether we can take this case or any other case and say, hey, it doesn't matter, you can do it under the law, they're playing games with it. I understand what you're saying. You're saying, in essence, you feel it offends you. You believe that we should look behind the reasons for the referrals. I mean, that's basically what you're saying. I'm saying that based upon this pattern. We have the authority under the case law to look behind the reasons for the referrals. That's where the argument breaks down. And the other thing is, the counsel made comments about the dissent. I'm just looking at the dissent. I believe that what Commissioner Lindsey was doing, she just didn't find the petitioner's testimony credible when she looked at all the facts. So she then looked at various things to talk about. You didn't mention this. She didn't bring the stuff from Hertel to Penn State. It wasn't important. Various things were raised, I think, in her head. It was a credibility question, I think, more than anything, as to why she thought that it's not related and there's a problem here. I know the opinion in terms of the last thing, in terms of her being laid off. She worked at the mines. There were two mines that they had contracts on. They lost the contracts to the mines. When they lost the contracts to the mines, that's a loss of business. And by losing that, and that was her job where she was working, you're going to have to readjust the labor because of the loss of the mines. So I think that her going on layoff was, in fact, an economic reason for that, regardless of the fact that they may have filed something for a relocation temporarily. But when they lost that labor of that contract, that business, there was a business interruption and they had to shift the labor. Thank you. Thank you, Counsel.